EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Jorge Luis Jorge Moreu<br><br>Peticionario<br><br>v.<br><br>El Pueblo de Puerto Rico<br><br>Recurrido | 2019 TSPR 23<br><br>201 DPR \_\_\_\_<br><br>Certiorari |

Número del Caso: CC-2018-945

Fecha: 4 de febrero de 2019

Tribunal de Apelaciones:

     Panel IV

Sociedad para Asistencia Legal:

     Lcda. Eileen N. Díaz Ortiz

Materia: Resolución del Tribunal con Voto particular de conformidad y Voto particular disidente y Resolución *nunc pro tunc*

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Jorge Luis Jorge Moreu

    Peticionario

       v.

El Pueblo de Puerto Rico     CC-2018-945     Certiorari

    Recurrido

RESOLUCIÓN

San Juan, Puerto Rico, a 4 de febrero de 2019.

A la petición de certiorari y la *Moción para Informar Traslado del Peticionario a Institución Adecuada,* no ha lugar a ambas.

Notifíquese inmediatamente.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Martínez Torres emitió un Voto particular de conformidad. La Jueza Presidenta Oronoz Rodríguez, la Juez Asociada señora Rodríguez Rodríguez y los Jueces Asociados señores Estrella Martínez y Colón Pérez expedirían. Además, el Juez Asociado señor Estrella Martínez emitió un Voto particular disidente.

José Ignacio Campos Pérez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

     Recurrido

       v.                    CC-2018-0945

José Luis Jorge Moreu

     Peticionario

Voto particular de conformidad emitido por el Juez Asociado Señor Martínez Torres

En San Juan, Puerto Rico, a 4 de febrero de 2019.

**Este recurso es académico** y este Tribunal no puede atender controversias que no son justiciables.

Parece increíble que tenga que insistir en un punto tan básico de Derecho pero es importante dejar el récord claro. El principio de justiciabilidad es indispensable para que un tribunal pueda atender una controversia y dispensar justicia. Como parte de ese principio, antes de evaluar los méritos de un caso, los tribunales tenemos la obligación de cerciorarnos de que tenemos un caso y una controversia viva ante nos. E.L.A. v. Aguayo, 80 DPR 552 (1958). Los tribunales

no somos un cuerpo deliberativo en asuntos de política pública como lo es la Asamblea Legislativa, y mucho menos una revista jurídica o una sociedad de debates legales, que atienden lo que quieran y discuten controversias legales en el éter de lo abstracto. La **legitimidad** de nuestras intervenciones y, por ende, nuestra **credibilidad** ante el público dependen de que intervengamos con controversias existentes y no con las que ya dejaron de tener vida legal. También depende de la autodisciplina que nos impone la toga para resistir el impulso de opinar sobre lo que ya no está planteado en un caso que se volvió académico. No somos árbitros encargados de resolver todos los males de la sociedad sino de los casos vivos que llegan ante nos.

Nuestra jurisdicción para atender esas controversias está delimitada por la aplicación de diversas doctrinas que conforman el principio jurídico constitucional de la justiciabilidad. Una de esas doctrinas es la de academicidad (*mootness*). Un caso se torna académico cuando los acontecimientos hacen que dejemos de estar ante una controversia viva y presente. Lozada Sánchez et al. v. JCA, 184 DPR 898 (2012); Emp. Pur. Des., Inc. v. H.I.E.Tel., 150 DPR 924, 936 (2000). Si la controversia pierde vigencia por cambios fácticos o jurídicos durante su trámite, y propicia un contexto en el que en lugar de dar un remedio que cambie la situación del litigante, el tribunal solo emitiría una opinión consultiva, el tribunal

tiene que abstenerse de resolver los méritos de la controversia. Angueira v. J.L.B.P., 150 DPR 10, 19 (2000). "De esta manera, se evita utilizar inadecuadamente los recursos judiciales y establecer precedentes innecesarios". Amador Roberts et als. v. ELA, 191 DPR 268, 283 (2014). Véase, además, Torres Santiago v. Depto. Justicia, 181 DPR 969 (2011).

Claro está, la doctrina de academicidad tiene excepciones, pero estas deben invocarse "con mesura". S.L.G. Szendrey-Ramos v. Consejo Titulares, 184 DPR 133, 151 (2011). Una de ellas es cuando estamos ante una controversia que se repite, pero para que el tribunal pueda intervenir se requiere que el asunto escape su jurisdicción. P.N.P. v. Carrasquillo, 166 DPR 70 (2005). Asoc. de Periodistas v. González, 127 DPR 704 (1991). No es que escape llegar al Tribunal Supremo, sino que las circunstancias frustren que la parte pueda obtener un remedio **en algún tribunal**, a pesar de la conducta ilegal de la otra parte. De hecho, nuestro sistema no está diseñado para que el Tribunal Supremo tenga que intervenir en toda controversia sino, por el contrario, para que las partes afectadas obtengan un remedio rápido, económico y eficaz, lo que implica que no tengan que agotar el tiempo y sus recursos para que sea el Tribunal Supremo quien les auxilie. **Hay otros tribunales que tienen la obligación de hacer ese trabajo también, en una instancia más temprana.**

La academicidad no es una mera inconveniencia técnica que se obvia invocando el "interés público". Si así fuera, poco valor tendría el principio de justiciabilidad, pues ese es el tipo de casos que usualmente llega a este Tribunal. **Nunca** hemos reconocido semejante excepción, y cuando se ha mencionado el interés público ha sido para justificar que el Tribunal se exprese en una controversia **que está viva y no se ha tornado académica**, que requiere "dilucidar derechos constitucionales de la más alta jerarquía", **no** para darle justiciabilidad artificial al caso. E.g., Lozada Tirado et al. v. Testigos Jehová, 177 DPR 893, 909 (2010) (El recurso no era académico porque persistían "importantes efectos colaterales". Íd., pág. 908.) Del mismo modo, véanse Bhatia Gautier v. Gobernador, 199 DPR 59, 73-75 (2017); U.P.R. v. Laborde Torres y otros I, 180 DPR 253, 281 (2010); Pueblo v. Pagán Medina, 177 DPR 842 (2010) (Resolución); Asoc. de Periodistas v. González, supra; Emp. Pur. Des., Inc. v. H.I.E.Tel., supra; Com. de la Mujer v. Srio. de Justicia, 109 DPR 715 (1980).

> **Finally, a public interest exception catapults a court out of its role as arbiter of disputes and into the role of legislator of social or political policy.** Without contested disputes as their starting point, courts could freely adjudicate a wide range of hypothetical or abstract questions. At its irreducible minimum, article HI [*sic*] of the Constitution still requires a federal court to resolve questions in the context of a case or controversy **and not to engage in caseless judicial legislation.** Certainly the demarcation

of what constitutes a case as opposed to a hypothetical question remains hazy, but the blithe rejection of a demarcation in matters of public importance transcends the basic function of a constitutional court. In Sosna [v. Iowa, 419 US 393 (1975)], a class action in which a named plaintiff's claim was mooted, and Sibron v. New York, [392 US 40 (1968)] a criminal conviction appeal persisting after the accused had served his sentence, the Supreme Court noted that courts may not deny review to an entire class of cases. The public interest exception tends to prevent this circumstance. To a large extent, however, other measures assure review. For example, the Court allows named class members to carry on after their claim is moot, and the importance of an issue may urge the Court to accept a lesser degree of likelihood that the action will recur with a particular plaintiff, as in Storer [v. Brown, 415 US 724 (1974)] and American Party [v. White, 415 US 767 (1974)]. Even if these measures prove inadequate to provide review, if no possibility of repetition with a particular litigant exists in a nonclass action, the public interest must defer to an expression of higher public concern, the constitutional requirements of article III. D. H. Donaldson, Jr., A Search for Principles of Mootness in the Federal Courts, 54 Tex. L. Rev. 1289, 1299 (1976) (énfasis suplido; escolios omitidos).

En este caso, este Tribunal no tiene ningún remedio que ofrecerle al imputado y peticionario, señor Jorge Moreu. Ya él prevaleció y obtuvo lo que reclamó. Tampoco estamos ante una controversia constitucional que escape la intervención judicial. Es altamente probable que, si existen los 87 casos similares que menciona el peticionario en su solicitud de certiorari, estos terminen en un tribunal, a menos que el Estado reconozca su error y corrija la situación que supuestamente enfrentan esos 87 imputados. La justicia no se frustraría.

Por todo lo anterior, es innecesaria nuestra intervención. Más aun, es improcedente. E.g., Asoc. Fotoperiodistas v. Rivera Schatz, 180 DPR 920, 936 (2011). Perdimos nuestra autoridad para intervenir en este asunto cuando se tornó académico y, como consecuencia, dejó de ser justiciable. Moreno v. Pres. U.P.R. II, 178 DPR 969, 974 (2010); E.L.A. v. Aguayo, supra, pág. 562. Si los tribunales inferiores se equivocaron o no, si la situación que enfrentó una vez el peticionario fue detestable o en violación de sus derechos civiles, si lo sucedido compara o no con otras situaciones que afectan a los confinados, es un asunto muy interesante para explorarlo a fondo en un libro o en una revista de Derecho, pero no se puede hacer en un dictamen judicial de un caso que jurídicamente murió, para beneficio del peticionario. Nuestras palabras se publican en los tomos titulados "Decisiones de Puerto Rico" y no en una inexistente "Revista Jurídica del Tribunal Supremo de Puerto Rico".

> Por último, es norma reiterada que "[e]n ausencia de circunstancias que ameriten la intervención judicial, no estamos en posición de emitir directrices con el propósito de guiar al Ejecutivo y al Legislativo en la encomienda que los electores le han delegado…. Todas estas consideraciones ameritan nuestra prudencia y abstención en estas circunstancias no aptas para la intervención judicial". Asoc. Fotoperiodistas v. Rivera Schatz, supra, pág. 939, citando Presidente de la Cámara v. Gobernador, 167 DPR 149, 162 (2006).

En fin, perdimos autoridad para intervenir en este caso. No podemos seguir cargándolo como los personajes de

la película "*Weekend at Bernie's*" (1989) arrastraban en público el cadáver de su jefe.



                          RAFAEL L. MARTÍNEZ TORRES
                               Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>José Luis Jorge Moreu<br><br>Peticionario | CC-2018-0945 | *Certiorari* |

Voto particular disidente emitido por el Juez Asociado Señor Estrella Martínez.

San Juan, Puerto Rico, a 4 de febrero 2019.

No puedo permanecer silente y validar el peligroso patrón de que las personas declaradas incapaces mentalmente para ser enjuiciadas sean privadas de su libertad indefinidamente. Esto, bajo el pretexto de que, mientras las únicas dos instituciones públicas de salud mental no puedan admitirlas, el Estado no tiene remedio alguno más que encarcelarlas por términos tan extensos como de **688 días.** De esta manera, protecciones constitucionales de alta jerarquía, como el derecho a la libertad, la presunción de inocencia, el derecho a la salud y el debido proceso de ley, se desvanecen frente a esta práctica. Asimismo, se deja desprovista de remedio alguno a una población tan vulnerable como lo son las

personas con enfermedades mentales, a las que ni siquiera se les ha adjudicado la comisión de un delito. Ante una práctica tan atroz que evidentemente lesiona derechos constitucionales y humanos fundamentales, hubiese expedido el recurso ante nuestra consideración. El sentido más básico de la justicia así lo exige.

Procedamos a examinar el trasfondo fáctico y procesal de la controversia de epígrafe.

**I**

El 7 de noviembre de 2016, el Tribunal de Primera Instancia halló causa probable para el arresto del Sr. José Luis Jorge Moreu (señor Jorge Moreu o peticionario) por alegadas infracciones al Artículo 127-A del Código Penal de Puerto Rico de 2012 (maltrato a personas mayores de edad), 33 LPRA sec. 5186a, y al Artículo 5.05 de la Ley de Armas de Puerto Rico (portación y uso de armas blancas), 25 LPRA sec. 458d. A raíz de ello, el foro primario fijó una fianza de $5,000. Debido a que el peticionario no pudo prestar dicha cantidad, fue encarcelado preventivamente.

Una vez en vista preliminar, se determinó causa probable para acusar al señor Jorge Moreu por dos cargos en violación al Artículo 127-A del Código Penal de Puerto Rico de 2012, más no se encontró causa probable por el Artículo 5.05 de la Ley de Armas de Puerto Rico. En esa ocasión, la Jueza del Tribunal de Primera Instancia hizo constar que "[s]e persigue restricción terapéutica o tratamiento para imputado si cualifica".[1] Añadió que los

---

[1] Resolución Vista Preliminar, Regla 23, Apéndice del certiorari, pág. 5.

padres del peticionario, quienes figuraban como los testigos del caso, brindaron su anuencia a tal tratamiento.

Cónsono con las preocupaciones de la Jueza del foro primario sobre la condición mental del señor Jorge Moreu, su representante legal solicitó una vista para determinar la procesabilidad del peticionario conforme a la Regla 240 de Procedimiento Criminal, 34 LPRA Ap. II. El 22 de diciembre de 2016, el foro primario acogió la solicitud del peticionario. En consecuencia, suspendió los procedimientos y ordenó al Departamento de Corrección y Rehabilitación (Departamento de Corrección), so pena de desacato, a trasladar al peticionario al Tribunal para que la psiquiatra del Estado lo evaluara. De igual forma, señaló una vista de procesabilidad para el 18 de enero de 2017. En la misma, testificaría la psiquiatra del Estado en torno a su evaluación de la condición mental del peticionario.

Sin embargo, la referida vista de procesabilidad fue pospuesta en tres ocasiones.[2] Esto, pues la psiquiatra del Estado comparecía e indicaba que no había podido evaluar al peticionario. En consecuencia, el señor Jorge Moreu estuvo detenido **118 días** (tres meses y veintiocho días) mientras se tramitaba el procedimiento para determinar su aptitud mental.

Finalmente, el 19 de abril de 2017, la psiquiatra realizó la correspondiente evaluación. En consecuencia,

---

[2]La vista de procesabilidad fue señalada inicialmente para el 18 de enero de 2017. Luego, la misma fue pospuesta para el 15 de febrero de 2017, para el 15 de marzo de 2017 y, finalmente, para el 19 de abril de 2017. Apéndice del certiorari, págs. 13, 15, 17, 20.

testificó que el peticionario estaba "poco cooperador, con agitación motora, t[enía] historial de tratamiento ambulatorio y no pudo hablar coherentemente sobre lo que se le acusaba, cargos y posibles consecuencias".[3] Por tales razones, sostuvo que el señor Jorge Moreu no era procesable, pues no estaba apto mentalmente para enfrentar el procedimiento judicial. Por tanto, recomendó su ingreso al Hospital Psiquiátrico Forense de la Administración de Servicios de Salud y Contra la Adicción (ASSMCA).

Ante este cuadro, el Tribunal de Primera Instancia acogió las recomendaciones de la psiquiatra y declaró al peticionario no procesable conforme a la Regla 240 de Procedimiento Criminal, supra. En consecuencia, el foro primario ordenó al Departamento de Corrección a trasladar al peticionario al Hospital Psiquiátrico Forense. A su vez, le ordenó a ASSMCA proveerle el tratamiento médico correspondiente.

A pesar de dicha orden, consta en el expediente la celebración de **siete** vistas en las cuales se le informó al Tribunal que el peticionario no había sido ingresado a hospital alguno y que continuaba en la cárcel.[4] En estas vistas, la psiquiatra del Estado informó que condujo evaluaciones periódicas al señor Jorge Moreu, quien consecuentemente mostró incapacidad para entender el procedimiento criminal en su contra debido a una deteriorada condición mental. En **todas** las vistas de seguimiento, el foro primario mantuvo y recalcó la orden de ingreso del peticionario al hospital.

---

[3] Minuta, Apéndice del certiorari, pág. 20.

[4] Apéndice del certiorari, págs. 22, 24, 30, 31, 38, 93-94 y 123.

Por su parte, la AMMSCA arguyó que la dilación en la admisión del peticionario se debía a falta de espacio en el hospital. Por tanto, informó que el señor Jorge Moreu se encontraba en una lista de espera de confinados y confinadas que, como el peticionario, habían sido encontrados no procesables, no habían podido pagar fianza y estaban detenidos en espera de disponibilidad en el hospital.

Ante este patrón de incumplimiento, el foro primario exigió tanto al Departamento de Corrección como a la ASSMCA que, de no poder cumplir con lo exigido por el Tribunal, tenían que notificarlo y fundamentarlo. Asimismo, en la última vista de seguimiento, el Tribunal de Primera Instancia emitió nuevamente una orden de traslado. En esta ocasión, la orden fue bajo apercibimiento de desacato.

Así las cosas, durante el transcurso de las referidas vistas, el 20 de marzo de 2018, el señor Jorge Moreu solicitó su excarcelación mediante un recurso de habeas corpus. El peticionario arguyó que llevaba más de seis meses en una institución penal, lo cual excedía el período máximo de detención preventiva. En consecuencia, el Tribunal de Primera Instancia señaló una vista para discutir la solicitud del peticionario. En la misma, el señor Jorge Moreu presentó una certificación del Departamento de Corrección que disponía que, hasta ese momento, el peticionario llevaba detenido un período de 513 días (un año con cinco meses y tres días).

Luego de escuchar los argumentos de ambas partes, el Tribunal de Primera Instancia denegó el habeas corpus y la

solicitud del peticionario. Sin embargo, recalcó nuevamente su orden a las agencias de trasladar al peticionario y de proveerle tratamiento médico.

Insatisfecho, el señor Jorge Moreu acudió al Tribunal de Apelaciones mediante _certiorari_. En ese momento, el peticionario llevaba 584 días encarcelado (un año, siete meses y siete días). En esencia, arguyó que su detención indeterminada en una institución penal, a pesar de repetidas órdenes exigiendo su traslado a una institución médica, laceraba las garantías constitucionales del debido proceso de ley y la presunción de inocencia. El peticionario indicó que, luego de que se suspendió el procedimiento judicial en su contra, el Estado estaba en control de todas las herramientas necesarias para que recibiera el tratamiento médico necesario, entiéndase, su diagnóstico y su posterior traslado a un hospital. En consecuencia, señaló que la dilación excesiva por parte del Estado resultó en una privación injusta y arbitraria de su libertad. Asimismo, sostuvo que dicha detención constituía un castigo previo a ser juzgado por unas acusaciones por las cuales se presume inocente.

Además, el señor Jorge Moreu destacó que fue discriminado por razón de su condición económica, pues una persona declarada no procesable que pague fianza o que sea ingresada involuntariamente a una institución hospitalaria al amparo de la Ley de Salud Mental de Puerto Rico, Ley Núm. 408-2000, 24 LPRA secs. 6152-6166g, no estaría sujeta a estar detenido mientras espera por el tratamiento médico correspondiente. En consecuencia, alegó que su detención

constituye un castigo discriminatorio que únicamente es aplicado a las personas pobres.

De igual forma, añadió que, cobijándose en el precedente de Pueblo v. Pagán Medina II, 178 DPR 228 (2010), el Estado le causó un grave perjuicio.[5] Ello, pues en aras de no responsabilizar al Estado por los retrasos en las instituciones hospitalarias públicas, se obligó al peticionario a mantenerse encarcelado indefinidamente hasta tanto surja disponibilidad. Alegó, entonces, que el resultado fue una situación insostenible. Particularmente, debido a que su encarcelamiento sin acceso al tratamiento médico adecuado deterioró su condición mental, su capacidad de volver a ser procesable y de enfrentarse al procedimiento criminal en su contra. De esta manera, planteó el peticionario que sus derechos quedaron al arbitrio del Estado.

Asimismo, manifestó que la detención indefinida del peticionario afectaba su derecho a una representación legal adecuada. Esto, pues el transcurso del tiempo limitaba su posibilidad de acceder a evidencia relevante para su defensa. Además, arguyó que se obstaculizó su acceso a los diagnósticos necesarios para futuras defensas de inimputabilidad o de no procesabilidad permanente.

Debido a todo lo anteriormente esbozado, el peticionario indicó que el Estado no podía cruzarse de brazos y detenerlo indefinidamente bajo el pretexto de que

---

[5] En este Voto particular disidente, estaremos discutiendo Pueblo v. Pagán Medina, 175 DPR 557 (2009) y su secuela en reconsideración Pueblo v. Pagán Medina, 178 DPR 228 (2010). Para evitar confusión entre ambos pronunciamientos, estaremos refiriéndonos a los mismos como Pueblo v. Pagán Medina I y Pueblo v. Pagán Medina II, respectivamente.

se le proveería la atención médica correspondiente sujeto a la disponibilidad del mismo Estado. Por ello, insistió que era responsabilidad del Estado proveerle alternativas para que recibiera el tratamiento médico que necesitaba.

Por su parte, el Procurador General sostuvo que al peticionario no le cobijaba la cláusula constitucional de detención preventiva debido a que, al ser declarado no procesable, se suspendieron tanto los procedimientos en su contra como el término máximo de detención de seis meses. Además, arguyó que el señor Jorge Moreu no estaba detenido indefinidamente, pues ostentaba un turno en una lista de espera para ser ingresado a uno de los hospitales públicos. Asimismo, destacó que no se puede responsabilizar al Estado por la falta de espacio en las instituciones médicas.

Ante este cuadro, el Tribunal de Apelaciones confirmó la denegatoria de excarcelación dictada por el Tribunal de Primera Instancia. Sin embargo, el foro intermedio manifestó su preocupación de que el peticionario aún no había recibido el tratamiento que en tantas ocasiones ordenó el Tribunal de Primera Instancia. A raíz de ello, señaló que era responsabilidad del Estado trasladar al peticionario "con la menor dilación posible" al hospital correspondiente.[6] De igual forma, enfatizó que el foro inferior debió ejercer su autoridad para hacer cumplir su orden de traslado pues "el tratamiento del peticionario dentro de un tiempo razonable amerita ser un asunto de alto interés público".[7] Cónsono con ello, resaltó que los

---

[6]Sentencia, Apéndice de certiorari, pág. 101.

[7]Íd., pág. 102.

confinados y confinadas no se encuentran en un vacío jurídico, pues están protegidos por el derecho interno, el derecho internacional de los derechos humanos y el derecho internacional humanitario.[8]

Debido a lo anterior, el peticionario presentó una Solicitud de reconsideración. El Tribunal de Apelaciones proveyó un término a la parte recurrida para fijar su posición. En esencia, ambas partes reiteraron los argumentos expuestos. Luego de la comparecencia de ambas partes, el foro intermedio denegó la reconsideración.

Por todo lo anteriormente expuesto, el señor Jorge Moreu acudió ante nosotros mediante un recurso de certiorari. En el mismo, el peticionario recalcó los argumentos esbozados ante el Tribunal de Apelaciones. Además, el señor Jorge Moreu nos solicitó que ordenáramos, bajo apercibimiento de desacato y sanciones, su traslado y admisión inmediata a una institución hospitalaria. Asimismo, el peticionario propuso que, en la alternativa, ordenáramos que se le proveyera el correspondiente diagnóstico y tratamiento de igual calidad de instituciones hospitalarias en la institución penal donde estaba detenido.

El 29 de noviembre de 2018, la representación legal del señor Jorge Moreu nos indicó que el peticionario fue finalmente ingresado en el Hospital de Psiquiatría Forense de Ponce. **El peticionario esperó por este traslado encarcelado en una prisión por un término de 688 días (un año, diez meses y diecinueve días).** Posteriormente, la

_____

[8]Íd. (citando a Pueblo v. Aponte Ruperto, res. el 4 de enero de 2018, 2018 TSPR 2, pág. 12) (Estrella Martínez, J., opinión de conformidad)).

psiquiatra del Estado visitó al peticionario en la institución para una evaluación de seguimiento, donde lo encontró en deteriorada condición mental por lo que sostuvo su no procesabilidad.

En torno a ello, la representación legal del señor Jorge Moreu arguye que la controversia ante nuestra consideración no se tornó académica. Esto, pues la misma es una cuestión recurrente que ha eludido la revisión del Tribunal Supremo. Señaló, además, que el Departamento de Corrección certificó que actualmente hay ochenta y siete confinados y confinadas declarados no procesables que se encuentran detenidos en instituciones penales en espera de un traslado a instituciones médicas.

## II

Como cuestión de umbral, debemos señalar que, aunque el señor Jorge Moreu fue ingresado finalmente a una institución médica, luego de 688 días encarcelado, la controversia ante nuestra consideración no se tornó académica. Veamos.

Como corolario de la doctrina de justiciabilidad, sabido es que los tribunales deben abstenerse de atender controversias cuyos acontecimientos y cambios durante el trámite judicial tornan su solución en académica o ficticia. Com. de la Mujer v. Srio. de Justicia, 109 DPR 715, 724-725 (1980). De esta manera, se evita el uso innecesario de los recursos judiciales, se garantiza suficiente adversidad para que haya rigurosidad en las argumentaciones legales y se evita un precedente redundante. Íd., en la pág. 725.

Ahora bien, la academicidad no limita nuestras facultades revisoras absolutamente. Por ello, hemos reconocido una serie de excepciones que nos permiten considerar controversias técnicamente académicas en aras de proteger los intereses de la justicia. Íd. Así, podemos atender recursos que sean susceptibles de repetirse y de evadir nuevamente revisión judicial. P.N.P. v. Carrasquillo, 166 DPR 70, 76 (2005). Para ello, éstas deben cumplir con tres requisitos: (1) probabilidad de que la controversia sea recurrente; (2) identidad de las partes involucradas en el pleito, y (3) expectativa de que el asunto evada la revisión judicial. Íd.

El primer requisito exige que haya una probabilidad razonable de que la controversia se repita o recurra. En estos casos, "los tribunales deben considerar el asunto planteado a pesar de que el mismo haya advenido académico". Asoc. de Periodistas v. González, 127 DPR 704, 721 (1991).

Por otro lado, el segundo elemento requiere que la controversia recurrente acuda a los foros judiciales mediante las mismas partes. Sin embargo, hemos dispuesto que hay controversias excepcionales que, aunque no tienen identidad de partes, ameritan nuestra intervención judicial. Particularmente, podemos adentrarnos en los méritos de casos que, aunque la recurrencia del caso pueda ser entre partes distintas, presentan cuestiones constitucionales de alto interés público. Lozada Tirado et al. v. Testigos Jehová, 177 DPR 893, 909 (2010). De esta manera, el elemento de la identidad de las partes figura como una "excepción a la excepción" de la doctrina de la

academicidad. E. Rivera Ramos & J. Farinacci Fernós, Derecho Constitucional, 80 Rev. Jur. UPR 603, 607 (2011). A modo de ejemplo, hemos ejercido nuestra facultad revisadora en casos relacionados con derechos constitucionales de alta jerarquía como la libertad de expresión, Emp. Pur. Des., Inc. v. H.I.E.Tel, 150 DPR 924 (2000), la libertad de prensa, Asoc. de Periodistas v. González, supra, y la igual protección de las leyes, Com. De la Mujer v. Srio. de Justicia, supra.

Finalmente, el tercer requisito exige la probabilidad de que el pleito evada adjudicación o revisión judicial. Frecuentemente, las controversias que evaden la revisión judicial son aquellas de corta duración. Asoc. de Periodistas v. González, supra, pág. 721. No obstante, hemos dispuesto que pueden "haber otras razones además de la brevedad cronológica que ocasionen que una controversia sea capaz de eludir la revisión judicial". Íd.

Precisamente, la controversia ante nuestra consideración cumple con los tres elementos necesarios para adjudicar el caso en sus méritos. Para el 1 de noviembre de 2018, habían 87 confinados y confinadas en las mismas condiciones que sufrió el señor Jorge Moreu, a saber, encarcelados por términos indefinidos condicionados a la disponibilidad de los hospitales públicos. Como agravante, son personas que padecen de enfermedades mentales. Por tanto, la controversia no solo es recurrente, sino que actualmente está vigente y palpable en nuestras prisiones.

Ahora bien, a pesar de que la controversia es susceptible de repetirse, las partes variarían debido a

que el señor Jorge Moreu ya fue trasladado a una institución médica. Sin embargo, como esbozaremos más adelante, esta práctica sostenida por el Estado de mantener encarceladas indefinidamente a personas declaradas incapacitadas mentalmente lacera derechos constitucionales de gran envergadura en nuestro ordenamiento, como lo son el derecho a la libertad, la presunción de inocencia y el derecho al debido proceso de ley. En consecuencia, al infligir directamente en estos principios constitucionales de alta jerarquía, ostentamos la legitimación para resolver la controversia y para denunciar los actos reprochables del Estado.

Finalmente, existe una probabilidad acertada de que el caso escaparía la revisión judicial nuevamente. Por tanto, **el calvario procesal que enfrentó el peticionario; los obstáculos para reclamar sus derechos; la incapacidad del Estado para proveer un tratamiento óptimo, adecuado, completo y oportuno, y las trabas argüidas por los foros inferiores evidencian la urgente necesidad de que este Tribunal ejerza su rol de pautar**. En consecuencia, era imperante que este Tribunal expidiera el recurso del peticionario y lo resolviera en sus méritos. Desde el disenso, procedo a exponer los fundamentos jurídicos que sustentan mi criterio.

### III

### A.

Sabido es que una de las garantías de mayor envergadura en nuestro ordenamiento es el debido proceso de ley. La Constitución de Puerto Rico consagra este derecho al proveer que "[n]inguna persona será privada de

su libertad . . . sin el debido proceso de ley". Art. II, Sec. 7, Const. PR, LPRA Tomo 1. La Constitución de los Estados Unidos exige igual protección a sus ciudadanos y ciudadanas. Emda. XIV, Const. EE. UU., LPRA, Tomo 1. La doctrina del debido proceso de ley exige que la interferencia del Estado en el derecho a la libertad de las personas se haga mediante un procedimiento justo e imparcial. Rivera Santiago v. Srio. de Hacienda, 119 DPR 265, 274 (1987). Asimismo, su propósito es "prote[ger] a las personas del poder abusivo por parte del Estado y . . . gener[ar] una atmósfera de justicia imparcial". D. Nevares-Muñiz, Sumario de Derecho Procesal Penal Puertorriqueño, 10ma ed., Puerto Rico, Instituto para el Desarrollo del Derecho, 2014, pág. 258.

El debido proceso de ley es una de las garantías más amplias en el contexto penal. E. L. Chiesa Aponte, Procedimiento Criminal y la Constitución: Etapa investigativa, Puerto Rico, Ediciones Situm, 2018, pág. 17. Esto, pues aplica en todas las etapas criminales, desde tan temprano como el procedimiento de investigación. Íd. En ese sentido, el debido proceso de ley protege a las personas de actos del Estado que estremezcan la conciencia (shock the conscience). Íd., pág. 19. En consecuencia, el Estado está impedido de actuar de forma fundamentalmente injusta (fundamentally unfair) en contra de una persona en un procedimiento criminal. Íd., págs. 19-20.

Es menester destacar que las limitaciones del debido proceso de ley aplican particularmente al Estado. R. E. Ortega-Vélez, Doctrinas jurídicas del Tribunal Supremo, Puerto Rico, Publicaciones JTS, 2008, Tomo I, pág. 436. En

ese sentido, cuando una persona invoca la garantía del debido proceso, "los tribunales deben interpretar los derechos constitucionales de forma amplia a favor de la protección del individuo frente al poder del Estado. Por el contrario, cuando se propone una interpretación que limitaría las libertades personales y ampliaría el poder del Estado, la interpretación debe ser extremadamente rigurosa". Pueblo v. Pagán Medina II, supra, pág. 252 (Fiol Matta, J., opinión disidente).

Ahora bien, en virtud del debido proceso de ley, el Estado está impedido de ejercitar una acción penal en contra de una persona incapaz mentalmente de entender el procedimiento criminal al que se enfrenta. Medina v. California, 505 US 437, 453 (1992) ("the criminal trial of an incompetent defendant violates due process"); Ruiz v. Alcaide, 155 DPR 492, 501 (2001); E. L. Chiesa Aponte, Derecho procesal penal de Puerto Rico y Estados Unidos, Colombia, Ed. Forum, 1993, Vol. III, pág. 252. Debido a lo anterior, es norma cardinal de nuestro ordenamiento que "[n]inguna persona será juzgada, convicta o sentenciada por un delito mientras esté mentalmente incapacitada". 34 LPRA Ap. II, R. 239. El propósito de este principio es "[e]vitar la injusticia de requerirle a un peticionario que enfrente un proceso criminal cuando éste no está mentalmente capacitado para ayudar en su defensa, lo cual podría culminar en una convicción errónea". Ruiz v. Alcaide, supra, pág. 501. De esta forma, "se promueve la confianza de la ciudadanía en el sistema judicial criminal, conservando su dignidad e integridad". Íd., págs. 501-502.

En consecuencia, es requisito indispensable para un procesamiento y enjuiciamiento criminal que la persona acusada sea procesable. El criterio de la procesabilidad se refiere a la capacidad mental de una persona para entender el procedimiento criminal en su contra y para poder ser partícipe activo de su defensa junto a su representación legal. Ruiz v. Alcaide, supra, pág. 499.

Debido a lo anterior, la Regla 240 de Procedimiento Criminal, supra, codifica el procedimiento a seguir cuando el tribunal entiende que la persona acusada no es procesable por estar mentalmente incapacitada. En estos casos, el tribunal deberá determinar si una preponderancia de la prueba demuestra que el acusado o acusada está mentalmente incapacitada.[9] Si es así, el tribunal suspenderá los procedimientos y señalará una vista en la cual se presentará evidencia pericial en torno al estado mental de la persona acusada. Ante este cuadro, si el tribunal concluye que no es procesable porque no ostenta la capacidad mental necesaria para ello, los procedimientos continuarán suspendidos y el tribunal podrá ordenar su reclusión en una "institución **adecuada**" para el correspondiente tratamiento médico. (Énfasis suplido). Íd.

Es menester destacar que, "la determinación de incompetencia para ser juzgado afecta numéricamente a más peticionarios en comparación con el uso de éstos en la

---

[9]Originalmente, la Regla 240 de Procedimiento Criminal y su jurisprudencia interpretativa disponían que el tribunal tenía la facultad de suspender los procedimientos si existía base razonable para concluir que la persona acusada estaba incapacitada mentalmente. Sin embargo, la Ley Núm. 281-2011 enmendó la Regla 240 de Procedimiento Criminal y dispuso que la determinación inicial del Juez se debe sustentar en preponderancia de la prueba.

defensa afirmativa de insanidad mental". <u>El incapacitado mental en el proceso criminal</u>, Conferencia Judicial de Puerto Rico, noviembre 1983, pág. 68. Es decir, son numerosas las personas acusadas que, debido a su condición mental, son declarados no procesables.

Ante este cuadro, examinemos el alcance de la Regla 240 de Procedimiento Criminal, <u>supra</u>, según delineado por este Tribunal. Veamos.

En <u>Ruiz v. Alcaide</u>, supra, atendimos el caso del Sr. Ramón Ruiz Ramos (señor Ruiz Ramos), quien fue encontrado no procesable y, en consecuencia, internado en el Hospital de Psiquiatría Forense. A raíz de ello, el señor Ruiz estuvo más de seis meses encarcelado en la prisión y posteriormente internado en el hospital. En consecuencia, el señor Ruiz Ramos alegó que debía ser liberado de la institución médica debido a que su reclusión constituía una violación al término máximo de detención preventiva de seis meses.

Ante ello, este Tribunal resolvió que, una vez una persona es declarada no procesable y es trasladada a una institución de salud mental, el tiempo que pasa internada recibiendo tratamiento médico no se considera una detención preventiva. Ello, pues la detención preventiva es aquel período mediante el cual se encarcela a una persona acusada que no paga fianza con el fin de garantizar su comparecencia a procedimientos ulteriores. Por tanto, se dictaminó que la persona declarada no procesable no es internada en un hospital para garantizar su comparecencia al juicio ni a etapas posteriores del procesamiento criminal, sino para proveerle el tratamiento

médico apropiado y necesario para su condición. En consecuencia, la persona no procesable recluida en una institución médica no puede hacer un reclamo de excarcelación al amparo de la protección constitucional de detención preventiva.

Ahora bien, en Ruiz v. Alcaide resolvimos que, una vez una persona es encontrada no procesable, esta sólo puede estar recluida en una institución médica por un tiempo razonable. Esto, pues "**consideraciones del debido proceso de ley y de igual protección de las leyes impiden que el Estado recluya indefinidamente a un imputado hallado judicialmente no procesable**". Íd., pág. 507. Dicha determinación es cónsona con pronunciamientos de la Corte Suprema de los Estados Unidos. Véase, Jackson v. Indiana, 406 US 715, 738 (1972).

Debido a lo anterior, la razonabilidad del término que una persona puede estar internada debido a su no procesabilidad dependerá de la probabilidad de que advenga capaz mentalmente para enfrentar el procedimiento criminal. Si, por el contrario, la persona se mantiene en un estado de no procesabilidad permanentemente, el Estado tiene la obligación de liberarla. Como único el Estado estaría justificado de mantenerla en su custodia, sería si la persona cumple con los rigurosos requisitos para una internación civil involuntaria. Para ello, debe representar un peligro o riesgo inmediato de infligir daño a sí mismo o a aquellos en su alrededor. Véase, Ley de Salud Mental de Puerto Rico, supra, 24 LPRA sec. 6153b. Si no están presentes esas circunstancias graves, "[e]l Estado no tiene un interés en internar involuntariamente a

personas que realmente no constituyen un peligro o representen un riesgo inminente de causar daño por razón de trastorno mental". Ruiz v. Alcaide, supra, pág. 508. Debido a que una persona no procesable no necesariamente cumplirá con los requisitos necesarios para ser internado involuntariamente por la vía civil, el Estado no podrá continuar deteniendo al no procesable indefinidamente.

Por último, en Ruiz v. Alcaide, resaltamos el hecho de que una persona no procesable internada en un hospital podría enfrentarse a un juicio varios años después de la comisión de un delito, lo cual tendría efectos adversos en su futura defensa. Específicamente, entendimos que "[e]ntre los varios aspectos que podrían afectarse están comprendidos la búsqueda de evidencia, localización y entrevista de testigos, entre otros; criterios holgadamente relevantes para la defensa del imputado". Íd., pág. 506.

De otra parte, en Pueblo v. Pagán Medina I, 175 DPR 557 (2009), atendimos el reclamo del Señor Benjamín Pagán Medina (señor Pagán Medina), quien fue acusado y detenido preventivamente debido a que no tuvo los recursos económicos para pagar la correspondiente fianza. Mientras estaba encarcelado, la representación legal del señor Pagán Medina alegó que el peticionario no estaba procesable, por lo que solicitó su evaluación en virtud de la Regla 240 de Procedimiento Criminal, supra. Así las cosas, comenzó a dilucidarse el correspondiente procedimiento, el cual demoró cien días. En consecuencia, el peticionario estuvo más de **tres meses** encarcelado

mientras se tramitó la petición de la defensa y finalmente se resolvió que no estaba procesable.

Posteriormente, el foro primario determinó que el señor Pagán Medina había advenido capaz de enfrentar el procedimiento criminal en su contra, por lo que fue dado de alta del hospital y nuevamente encarcelado en la institución penal. Íd. A raíz de ello, el señor Pagán Medina presentó una petición de habeas corpus en la que solicitó ser excarcelado por estar detenido preventivamente en exceso del término máximo constitucional de seis meses. Íd., pág. 563. Por su parte, el Procurador General arguyó que el cómputo de los seis meses de detención preventiva se debía detener desde que el tribunal tuvo base razonable para concluir que la persona acusada estaba incapacitada mentalmente. Íd., pág. 564. En consecuencia, sostuvo que los tres meses que el señor Pagán Medina estuvo encarcelado mientras se evaluaba su condición mental no constituía una detención preventiva y, por ende, no procedía su excarcelación.

Ante este escenario, consideramos que, mientras se dilucida la evaluación de la procesabilidad de una persona en virtud de la Regla 240 de Procedimiento Criminal, ésta continúa bajo la custodia del Estado y encarcelada hasta tanto se tramite su traslado a un hospital público. A raíz de ello, inicialmente resolvimos que el término máximo de detención preventiva de seis meses se interrumpía únicamente cuando la persona es, en efecto, excarcelada, trasladada e internada en una institución médica. En consecuencia, mientras la persona se mantenga encarcelada durante los trámites dispuestos en la Regla 240 de

Procedimiento Criminal, no se suspendería el término de detención preventiva.

Por tanto, razonamos que, aunque el Estado esté impedido de llevar acción criminal alguna, no podíamos obviar la realidad de que las personas no procesables están encarceladas en una prisión mientras se dilucida el procedimiento para determinar su procesabilidad. Debido a lo anterior, concluimos que el derecho a la libertad personal y su principio concomitante, la presunción de inocencia, nos exigían resolver que el factor determinante para la interrupción de la detención preventiva era el momento en que la persona comenzó a recibir el tratamiento médico necesario. Razonamos, pues, que "[d]ecidir lo contrario **dejaría al arbitrio del Estado retener al peticionario bajo su custodia después de la orden de reclusión, sin trasladarlo, en perjuicio de su libertad".** (Énfasis suplido). Íd., pág. 574. Por todo lo anteriormente expuesto, sostuvimos que "al computar el término máximo de detención preventiva, debe excluirse, solamente, el tiempo en que el peticionario está efectivamente recluido en una institución adecuada para su tratamiento, por orden del tribunal". Íd., pág. 574.

No obstante lo anterior, en Pueblo v. Pagán Medina II, supra, se aplicó la excepción de la doctrina de academicidad, lo cual ahora rehúsa hacer una Mayoría de este Tribunal, y se revocó en reconsideración a Pueblo v. Pagán Medina I, supra. En Pueblo v. Pagán Medina II, este Tribunal razonó que, debido a que los procedimientos criminales se paralizan en virtud del comienzo de un trámite conforme a la Regla 240 de Procedimiento Criminal,

el Estado está impedido de proseguir la acción penal en contra de la persona acusada. En consecuencia, pautó que, una vez el tribunal tiene base razonable para ordenar la evaluación de la condición mental del peticionario, se activa una presunción de no procesabilidad que podrá ser o no revertida en la correspondiente vista de procesabilidad. Si se confirma la no procesabilidad y no se revierte la presunción, la persona acusada se entenderá no procesable desde el momento en que se paralizaron los procedimientos en virtud de la Regla 240 de Procedimiento Criminal.

Ahora bien, en <u>Pueblo v. Pagán Medina II</u> dispusimos además que el término de tres meses por el cual estuvo encarcelado el señor Pagán Medina en espera del procedimiento para determinar su procesabilidad fue **irrazonable**. Esto, pues reconocimos que uno de los efectos de la no procesabilidad es que la persona acusada permanece bajo la custodia y jurisdicción del Estado. Por tal razón, resolvimos que es responsabilidad del foro primario garantizar que la persona acusada sea evaluada a la brevedad posible luego de que se determine la existencia de base razonable de no procesabilidad. Para ello, el tribunal debe ordenar las medidas que entienda adecuadas, incluyendo la herramienta del desacato. De igual forma, una vez se determine la no procesabilidad, el tribunal deberá "tomar las previsiones para que la orden de reclusión y traslado a la institución correspondiente se cumpla con la menor dilación posible; nuevamente, so pena de desacato".

Finalmente, en <u>Pueblo v. Méndez Pérez</u>, 193 DPR 781 (2015), atendimos la controversia del Sr. Edwin Méndez Pérez (señor Méndez Pérez). Mientras el señor Méndez Pérez estaba detenido preventivamente, su representación legal alegó su falta de procesabilidad. Posteriormente, fue declarado no procesable y trasladado a una institución médica. El señor Méndez Pérez estuvo 266 días (ocho meses y veintidós días) en espera del trámite en virtud de la Regla 240 de Procedimiento Criminal y posteriormente internado en el hospital. Más adelante, el peticionario advino la capacidad mental necesaria para continuar en el proceso penal así que fue declarado procesable y se reanudó el procedimiento criminal en su contra.

Así las cosas, el señor Méndez Pérez llegó a un acuerdo con el Ministerio Público, el cual fue notificado y aceptado por el tribunal. Sin embargo, en el cómputo de la pena correspondiente, el foro primario descontó el período que el señor Méndez Pérez estuvo encarcelado y procesable, más no incluyó los 266 días que el peticionario estuvo encarcelado en espera del trámite de la Regla 240 de Procedimiento Criminal y su posterior reclusión en una institución médica.

Ante este escenario, resolvimos que el tiempo que el señor Méndez Pérez estuvo internado en el hospital psiquiátrico constituye una privación de su libertad. A esos efectos, reconocimos una vez más que "[u]na persona acusada no deja de estar bajo la custodia y la jurisdicción del Estado por el hecho de no encontrarse procesable". Íd., pág. 792. Cónsono con ello, identificamos que, "a pesar del tratamiento clínico, el

Estado continúa privando de su libertad al peticionario de una manera **coercitiva**". Íd., pág. 793. En consecuencia, sostuvimos que el tiempo que una persona acusada no esté procesable constituye una privación de su libertad por lo que debe ser descontado de la pena impuesta posteriormente.

Nótense las protecciones que nuestro ordenamiento provee a las personas no procesables con el propósito de garantizar que éstas reciban el tratamiento médico adecuado. Entonces, ¿cómo dejar en el olvido al momento de aplicar el Derecho a las personas que se encuentran por cientos de días en una cárcel con una determinación de no procesabilidad y sin recibir el tratamiento médico prescrito? Sin duda alguna, este patrón institucional contraviene los derechos humanos y constitucionales básicos, por lo que debe estremecer nuestra conciencia.

Procedemos a examinar otras garantías y protecciones que cobijan a las personas no procesables.

**B.**

Como es conocido, todos los seres humanos gozan de una gama de derechos. Entre ellos, se encuentra el derecho a la libertad, el cual es un derecho humano esencial que figura como el eje central de la democracia y la justicia. Es por ello que la Constitución "reconoce como derecho fundamental del ser humano el derecho . . . a la libertad". Art. II, Sec. 7, Const. PR, supra. La Constitución de los Estados Unidos reconoce, de la misma forma, el derecho a la libertad. Emda. XIV, Const. EE. UU., supra. El rol de la libertad es tan protagónico, que "[p]uede decirse que todo el andamiaje constitucional va

dirigido a la defensa de la libertad del ser humano, como valor esencial". P. Malavet Vega, Derechos y libertades constitucionales en Puerto Rico, Puerto Rico, Ediciones Lorena, 2003, pág. 272. La envergadura del derecho fundamental a la libertad es innegable. Pueblo v. Aponte Ruperto, 199 DPR 538, 542 (2018) (Oronoz Rodríguez, J., opinión de conformidad). Por ello, su ejercicio y respeto definen los contornos de una sociedad "verdaderamente civil y democrática". Íd., págs. 542-543.

No obstante, "[a] pesar de la enorme lucha histórica por el derecho a la libertad, este derecho es probablemente el más frágil de todos: se pierde con gran facilidad". Malavet Vega, op. cit., pág. 273. Esto, pues "[e]ntre los derechos y libertades fundamentales del ser humano, el que, de siempre, más ha sufrido los embates de la actividad represiva cuando no francamente autoritaria de los órganos del Estado, es el de la libertad personal . . .". Ponce Ayala, Ex Parte I, 179 DPR 18, 31 (2010) (Fiol Matta, J., opinión disidente) (citando a J. Rodríguez y Rodríguez, La detención preventiva y los derechos humanos en derecho comparado, México, Universidad Nacional Autónoma de México, 1981, pág. 5).

A raíz de ello, nuestro ordenamiento constitucional se ha enfocado en prevenir la privación del derecho a la libertad mediante la garantía de un debido proceso de ley. Malavet Vega, op. cit., pág. 273. Cónsono con ello, el andamiaje criminal cuenta con una serie de garantías mínimas constitucionales diseñadas para proteger a las personas acusadas que se enfrentan, precisamente, a una privación de su libertad mediante su encarcelamiento. En

ese sentido, "[l]as protecciones jurídicas que amparan a toda persona sometida a detención por autoridades del Estado se encuentran íntimamente vinculadas a la protección misma de los derechos humanos y fundamentales del individuo". Ex Parte Ponce Ayala, supra, pág. 39 (Rodríguez Rodríguez, J., opinión disidente).

Entre estas garantías constitucionales del ámbito penal, se encuentra el principio cardinal del derecho a la presunción de inocencia. Art. II, Sec. 11, Const. PR, supra.
Asimismo, la Corte Suprema de los Estados Unidos ha reconocido el rango constitucional de la presunción de inocencia. Véase, Estelle v. Williams, 425 U.S. 501 (1976); Coffin v. United States, 156 U.S. 432, 453 (1895). La presunción de la inocencia de una persona que se enfrenta a un procedimiento criminal es "piedra angular de nuestro ordenamiento jurídico". Ruiz v. Alcaide, supra, pág. 524 (Hernández Denton, J., opinión disidente). Esta protección constitucional es de alta jerarquía debido a que "[g]arantiza la preeminencia del derecho individual a la libertad sobre el poder acusatorio del Estado. Dicho precepto constitucional no se limita a ser sólo una regla de derecho probatorio, sino que es más bien una ideología que debe empapar todo nuestro sistema de justicia criminal". Íd. Por tal razón, otras protecciones como el derecho a la fianza y el derecho a no estar detenido preventivamente por un término mayor de seis meses surgieron en virtud de salvaguardar el "superior derecho" de la presunción de la inocencia. Íd. (citando a Sánchez

v. González, 78 DPR 849, 856 (1955) (Negrón Fernández, J., opinión de conformidad)).

Finalmente, es menester enfatizar que, la Constitución de Puerto Rico establece, como política pública, que el propósito del confinamiento es la "rehabilitación social y moral". Art. VI, Sec. 19, Const. ELA, supra. En consecuencia, existe un mandato constitucional que nos exige promover la rehabilitación de los confinados y confinadas a fines de lograr su reinserción social. Sin embargo, "es conocido que si bien pueden existir mandatos de política pública sustantiva en las constituciones, es labor de los operadores jurídicos y de los órganos jurisdiccionales el darles contenido material". L. A. Zambrana González, La rehabilitación de la persona convicta como derecho humano: Su tensión con el ordenamiento penitenciario de Puerto Rico, 87 Rev. Jur. UPR 1117, 1133 (2018).

## c.

Por último, es importante destacar que la Constitución de Puerto Rico dispone que la dignidad del ser humano es inviolable. Art. II, Sec. 1, Const. PR, LPRA, supra. Asimismo, consagra el derecho humano a la vida. Íd. Art. II, Sec. 7. En consecuencia, nuestro ordenamiento ha reconocido que de éstos emana el derecho a la salud. Particularmente, se ha identificado el derecho a la salud del ser humano como un elemento fundamental para el "disfrute cabal de sus derechos". Ley del Derecho a la Salud de Puerto Rico, Ley Núm. 150 de 19 de agosto de 1996, 1996 LPR 643. Asimismo, el referido estatuto dispone

que el derecho a la salud constituye "la columna natural que sostiene el derecho civil a la vida". Íd.

Como es sabido, la población confinada no está exenta de los derechos a la vida, a la dignidad y a la salud. Por tal razón, tanto en Puerto Rico como en Estados Unidos, esta población ha sido proactiva en reclamar sus derechos. Particularmente, en el extenso pleito de Morales Feliciano v. Romero Barceló, 497 F.Supp. 14 (D. PR 1979), confinados de Puerto Rico presentaron una demanda de clase ante la Corte de Distrito de Estados Unidos para el Distrito de Puerto Rico (Corte de Distrito Federal) en contra del Gobierno de Puerto Rico por una gama de violaciones a sus derechos constitucionales. El mismo es importante para esta discusión porque vislumbra el contexto de las prisiones en Puerto Rico y la importancia de las condiciones de salud en las mismas. Veamos.

En Morales Feliciano v. Romero Barceló, supra, los confinados impugnaron el hacinamiento, las condiciones de salud y la situación de las personas enfermas mentalmente. C. E. Ramos González, El caso Morales Feliciano y el ataque deliberado de causar sufrimiento, 37 Rev. Jur. UIPR 247, 250 (2003). Mediante el mismo, se visibilizaron las condiciones de salud infrahumanas y extremadamente precarias en las cuales vivían los confinados y confinadas con enfermedades mentales. Específicamente, reveló las condiciones en las que vivían los enfermos mentales en la llamada "Máxima de Locos" en la Institución Regional de Bayamón. Allí, se encontraron a los confinados enfermos en las siguientes condiciones:

> The inmates in "Máxima de Locos" are kept in
> cells naked, without beds, without mattresses,

without any private possessions, and most of them without toilets that work and without drinking water. They are being cared for by an inmate who washes them daily. There are feces all over their cells and the stench is overpowering. Only two of the 18 are receiving medication. Morales Feliciano v. Romero Barceló, supra, pág. 29.

Ante este escenario, la Corte de Distrito Federal resolvió a favor de la clase y denunció el trato inhumano y violatorio de los derechos constitucionales que estaba proveyendo el Estado a su población confinada. Íd., pág. 33. Por tanto, ordenó una multitud de remedios al Estado que, como es sabido, han sido difíciles de implementar. Íd., págs. 39-41; Ramos González, supra, págs. 254-255. Sin embargo, la mayoría de estas órdenes estaban dirigidas específicamente a salvaguardar los derechos de las personas confinadas con condiciones mentales. Morales Feliciano v. Romero Barceló, supra, págs. 39-41.

No obstante lo anterior, el tratamiento de salud en las prisiones de Puerto Rico continuó siendo deficiente. Por tal razón, en el año 1998, la Corte de Distrito Federal ordenó el establecimiento de una corporación sin fines de lucro con la responsabilidad de proveer planes médicos e implementar un sistema efectivo de tratamiento a la salud mental. Morales Feliciano v. Rosselló González, 13 F.Supp. 2d 151, 212-214 (D. PR 1998).

Posteriormente, en el año 2003, la Corte de Distrito Federal nuevamente denunció las condiciones de salud en las prisiones. Morales Feliciano v. Calderón Serra, 300 F.Supp. 2d 321 (D. PR 2004). En esa ocasión, el descubrimiento de prueba evidenció, entre múltiples fallas, que la unidad médica de una de las prisiones en Puerto Rico no había contado con los servicios de un

profesional psiquiátrico durante meses. Íd., pág. 331. A raíz de ello, la Corte de Distrito Federal concluyó lo siguiente:

> [T]he only finding that the court can make is that the Correctional Health Program and the Department of Health continue to fail in the administration of increased resources and continue to violate prisoners federally protected constitutional rights. The court cannot but underline that denial of health services is massive and systematic. Íd., pág. 324.

Asimismo, determinó que el consecuente trato deficiente que continuaba brindando el Estado se debía, en gran parte, a la falta de cooperación entre el Departamento de Corrección y el Departamento de Salud. Íd.

Por todo lo anteriormente esbozado, **la Corte de Distrito Federal determinó que la responsabilidad de proveer servicios adecuados de salud en las prisiones de Puerto Rico corresponde únicamente al Departamento de Corrección**. Íd., pág. 345. En consecuencia, el Departamento de Corrección tiene actualmente la responsabilidad de "establecer programas para prestar a la población correccional servicios médico-asistenciales y hospitalarios **adecuados**, dirigidos a la prevención de enfermedades y el diagnóstico y pronto tratamiento del paciente". (Énfasis suplido). Plan de Reorganización del Departamento de Corrección y Rehabilitación de 2011, Ley Núm. 2 de 21 de noviembre de 2011, 3 LPRA Ap. XVIII. El acuerdo transaccional que culminó con el pleito de Morales Feliciano no alteró esta responsabilidad del Departamento de Corrección. Véase, Morales Feliciano v. García Padilla, Amended Private Settlement and Benefits Proposal, USDC Civil No. 79-4.

Examinado el derecho aplicable, procedo a exponer las razones por las que entiendo que el Estado violó los derechos constitucionales del señor Jorge Moreu.

**IV**

**A.**

Como expuse anteriormente, el Estado acusó al señor Jorge Moreu por dos cargos en violación al Artículo 127-A del Código Penal de Puerto Rico de 2012, 33 LPRA sec. 5186a. Desde etapas tempranas del procedimiento criminal, el Tribunal de Primera Instancia hizo constar preocupaciones sobre el estado mental del peticionario. Así las cosas, la representación legal del señor Jorge Moreu arguyó que el peticionario no era procesable, por lo que solicitó una vista a esos propósitos en virtud de la Regla 240 de Procedimiento Criminal. Desafortunadamente, desde ese momento comenzaron las violaciones crasas por parte del Estado a los derechos constitucionales del señor Jorge Moreu.

La vista señalada por el foro inferior para determinar la procesabilidad del peticionario fue pospuesta en tres ocasiones. Esto, debido a que la psiquiatra del Estado no realizó la evaluación psicológica ordenada por el tribunal. En consecuencia, el señor Jorge Moreu estuvo privado de su libertad **118 días** (tres meses y veintiocho días) mientras se tramitaba el procedimiento para determinar su aptitud mental.

No obstante, en <u>Pueblo v. Pagán Medina II</u>, resolvimos **específicamente** que la detención de una persona por un término de tres meses mientras se dilucida un procedimiento en virtud de la Regla 240 de Procedimiento

Criminal es **irrazonable**. Íd., pág. 245. Sostuvimos esta determinación en el hecho innegable y evidente de que, mientras se tramita el referido procedimiento, la persona sujeta al mismo se encuentra privada de su libertad en una institución penal. A raíz de ello, ordenamos a los foros inferiores a garantizar que las personas acusadas sean evaluadas a la brevedad posible y que utilicen los mecanismos adecuados para ello. Íd.

Debido a lo anterior, entiendo que tanto el Departamento de Corrección como los foros inferiores erraron al permitir estas dilaciones en detrimento de los derechos del señor Jorge Moreu.

**B.**

Ahora bien, una vez el señor Jorge Moreu fue declarado no procesable y, por ende, incapaz mentalmente de enfrentar el procedimiento criminal en su contra, el foro primario ordenó su traslado al Hospital Psiquiátrico Forense de la ASSMCA. A pesar de ello, en siete vistas de seguimiento se le informó al Tribunal de Primera Instancia que el peticionario continuaba detenido en la cárcel y que su traslado no había sido tramitado. Esto, pues se alegó que los hospitales públicos no tenían disponibilidad para admitir al señor Jorge Moreu.

La dilación, inacción e indiferencia del Estado redundó en la detención del señor Jorge Moreu por un término de 688 días en una cárcel. Es decir, una persona con una enfermedad mental fue privada de su libertad por una duración de casi dos años en una prisión sin acceso a tratamiento médico. Como agravante, la detención estuvo

totalmente condicionada al arbitrio del Estado, pues éste es el responsable de conllevar su diagnóstico y de ingresarlo al hospital correspondiente.

Ante este cuadro, tanto el Procurador General como los foros inferiores alegan que el señor Jorge Moreu está desprovisto de remedio alguno debido a que, una vez declarado no procesable, se suspendió el procedimiento criminal en su contra. En consecuencia, arguyen que la interrupción del término máximo de detención preventiva impide que el peticionario solicite su excarcelación. De esta manera, razonan que los confinados y confinadas declarados no procesables están despojados de remedio o protección alguna. No les asiste la razón.

Precisamente, en Pueblo v. Pagán Medina II, supra, determinamos que el Estado debe ser diligente y tomar las previsiones necesarias para que la orden de reclusión de una persona no procesable se ejecute con la **menor dilación posible**. Íd., pág. 245. Esto, pues a pesar de que la persona no procesable no está cobijada en la cláusula de detención preventiva, ésta no se encuentra en un vacío jurídico. Más aún, no podemos ignorar que, más allá de ese precedente, el peticionario goza de derechos individuales y protecciones constitucionales que estamos llamados a interpretar ampliamente frente al poder del Estado. Por tanto, la suspensión del término máximo de detención preventiva de seis meses en virtud de una determinación de no procesabilidad no puede ser un subterfugio para detener al señor Jorge Moreu indefinida y arbitrariamente. Es por ello que, a pesar de que una reclusión involuntaria irrazonable a razón de una determinación de no

procesabilidad no da paso a un reclamo de detención preventiva, la persona perjudicada sí está cobijada por el debido proceso de ley, al igual que las otras garantías discutidas en este disenso. Véase E.L. Chiesa Aponte, Procedimiento Criminal, 72 Rev. Jur. UPR 587, 599 (2003).

De igual forma, en Ruiz v. Alcaide, supra, resolvimos que una detención indefinida e indeterminada en una **institución médica** es violatoria del debido proceso de ley. Íd., pág. 507. En esa ocasión, razonamos que el Estado no tiene un interés apremiante de recluir indefinidamente a personas en sus hospitales que no constituyan un peligro para la sociedad. De esta manera, aclaramos que el único fundamento que justifica la detención indefinida en un hospital es si la persona cumple con las circunstancias extraordinarias que dispone la Ley de Salud Mental de Puerto Rico, supra. Asimismo, hemos reconocido que incluso la reclusión en un hospital constituye una privación de libertad bajo el poder coercitivo del Estado. Pueblo v. Méndez Pérez, supra, pág. 792.

Por tanto, no debe existir duda alguna de que la detención indefinida del señor Jorge Moreu en una **institución penal** en espera de disponibilidad de un hospital constituyó una violación del debido proceso de ley. El Estado no demostró ni alegó interés apremiante alguno de mantener a una persona incapaz de enfrentar el procedimiento criminal en su contra privado de su libertad por un término de casi dos años. Tampoco surge del expediente intento alguno por parte del Estado para determinar si el peticionario reflejaba algún peligro

hacia la sociedad, conforme a la Ley de Salud Mental de Puerto Rico, supra.

Asimismo, la detención indefinida del señor Jorge Moreu constituyó una intervención injusta y arbitraria en su derecho a la libertad. Esto, pues la privación de su libertad estaba sujeta enteramente al arbitrio del Estado. El Estado es el responsable de tramitar su diagnóstico y su ingreso al hospital. En consecuencia, es fundamentalmente injusto que una persona incapacitada mentalmente esté privada de su libertad debido a la ineficiencia del Estado.

De igual forma, la detención del peticionario viola crasamente la protección que provee la presunción de inocencia. Esta garantía constitucional tiene como propósito, precisamente, salvaguardar la preeminencia del derecho a la libertad sobre el poder acusatorio del Estado. No obstante, en el caso del señor Jorge Moreu se obvió este principio cardinal y se le castigó previamente durante 688 días por un delito por el cual no ha sido declarado culpable.

Por otra parte, es menester destacar los efectos que genera la práctica incurrida por el Estado. Una persona con la capacidad para entender el procedimiento criminal en su contra no puede estar privada de su libertad más de seis meses en virtud de la cláusula constitucional de detención preventiva. Art. II, Sec. 11, Const. PR, supra. Sin embargo, una persona declarada no procesable puede estar hasta 688 días encarcelada. En consecuencia, paradójicamente, una persona incapaz mentalmente que reclama su derecho en virtud del debido proceso de ley a

obtener tratamiento médico para poder entender la naturaleza del procedimiento criminal en su contra está en peor posición que una persona procesable. De esta manera, desafortunadamente se está incurriendo en el escenario advertido en Pueblo v. Pagán Medina I, supra. Esto, pues se está poniendo a las personas acusadas en la situación de tener que escoger entre salvaguardar su derecho constitucional a un debido proceso de ley y su derecho a la libertad personal. Íd., pág. 573. Asimismo, se está dejando al arbitrio del Estado retener a las personas no procesables bajo su custodia después de la orden de reclusión, sin trasladarlo, en perjuicio de su libertad. Íd., pág. 574. No hay fundamento alguno de justicia que sostenga un trato tan desigual y discriminatorio.

Finalmente, otra consideración importante de la detención indefinida de una persona no procesable es su implicación en una representación legal adecuada. En Ruiz v. Alcaide, supra, dispusimos que la internación extendida de una persona no procesable en una institución médica podría lacerar su habilidad de defenderse en el futuro. Íd., pág. 506. Esto, pues el transcurso del tiempo limita el acceso de la persona acusada a evidencia documental y testifical, a futuras defensas de inimputabilidad, entre otros. En consecuencia, la detención del señor Jorge Moreu y su estado de incapacidad mental por una duración de casi dos años probablemente tendrán efectos en su futura defensa, si algún día adviene procesable.

Por todo lo anteriormente expuesto, sostengo que los foros inferiores erraron al sostener y validar una

detención de una persona incapacitada mentalmente por un término de 688 días.

### C.

Por su parte, el Departamento de Corrección y la ASSMCA aseveraron que incumplieron con la orden del Tribunal de Primera Instancia de trasladar al señor Jorge Moreu a una institución hospitalaria debido a la falta de disponibilidad en la misma. Por tal razón, colocaron al señor Jorge Moreu en una lista de espera junto a otros confinados y confinadas que, al igual que el peticionario, sufrían de alguna incapacidad mental y se había ordenado su ingreso a un hospital. Mientras tanto, el señor Jorge Moreu permaneció privado de su libertad en una cárcel sin acceso a tratamiento médico adecuado. A raíz de ello, el mismo Estado mediante su psiquiatra recomendó consecuente e insistentemente que la condición mental del peticionario exigía su ingreso a una institución hospitalaria.

El tratamiento médico insuficiente y poco apropiado que el señor Jorge Moreu recibió en el Departamento de Corrección está en evidente contravención con lo ordenado por la Corte de Distrito Federal. Precisamente ante el trato médico inhumano que estaba proveyendo el Estado en las prisiones de Puerto Rico, la Corte de Distrito Federal ordenó que el Departamento de Corrección asumiera su responsabilidad de salvaguardar el derecho a la salud de sus confinados y confinadas. Morales Feliciano v. Calderón Serra, supra. Asimismo, el Departamento de Corrección incumplió a su obligación de proveer "servicios médico-asistenciales y hospitalarios adecuados, dirigidos . . .

[al] **pronto tratamiento** del paciente". Plan de Reorganización del Departamento de Corrección y Rehabilitación de 2011, supra. En consecuencia, es insuficiente que el Departamento de Corrección se cruce de brazos y que no atienda la condición mental de un confinado bajo su custodia hasta tanto surja disponibilidad en una entidad separada. La abstención del Departamento de Corrección de asumir su deber y delegarlo en otra agencia refleja un patrón peligroso y preocupante, pues esta situación fue igualmente denunciada en el pleito federal.

Asimismo, es importante resaltar que la representación legal del peticionario solicitó, en varias ocasiones, que el Estado le proveyera alguna alternativa al señor Jorge Moreu. Entre éstas, que se le proveyera un tratamiento médico a la altura del que recibiría en un hospital desde las facilidades de la institución penal o que se le trasladara a un hospital privado.

Sin embargo, no consta esfuerzo alguno por el Ministerio Público, por el Departamento de Corrección ni por ASSMCA para considerar alguna alternativa ante la situación del señor Jorge Moreu. En todo momento, el Estado se ha sostenido en que el único remedio para una persona enferma mentalmente declarada no procesable y ordenada a ser internada médicamente es permanecer encarcelada hasta tanto surja disponibilidad en un hospital público. En vez de auscultar alguna otra alternativa para las circunstancias del señor Jorge Moreu, el Estado hizo caso omiso a los reclamos del peticionario y se cruzó de brazos. Esto, albergándose en el alegato de

que el Estado no debe ser penalizado por la falta de disponibilidad en sus propios hospitales públicos. Sin embargo, las deficiencias administrativas de las agencias estatales y la crisis fiscal no son fundamentos para violar derechos constitucionales fundamentales. Por ende, el Estado tenía la obligación de tomar acciones afirmativas y de auscultar alternativas para remediar la situación el señor Jorge Moreu.

Por todo lo expuesto, entiendo que erraron los foros inferiores al validar la abstención del Departamento de Corrección de asumir su deber en torno a la salud de los confinados y confinadas bajo su jurisdicción. Asimismo, sostengo que el Estado tenía una responsabilidad de proveer alternativas de tratamiento médico adecuado al señor Jorge Moreu.

**D.**

Por último, es menester destacar que constan siete vistas de seguimiento en el expediente en las cuales se le informó al Tribunal de Primera Instancia que el señor Jorge Moreu continuaba detenido en la cárcel y que su traslado no había sido tramitado. En cada una de esas vistas, el foro primario reiteró su orden de ingreso. Sin embargo, el Departamento de Corrección y la ASSMCA hicieron caso omiso a las órdenes del Tribunal. Incluso, no acreditaban ante el foro inferior las razones que fundamentaban su incumplimiento. Por tal razón, el 19 de septiembre de 2018 el foro inferior se vio obligado a exigir que las agencias tendrían que detallarle al tribunal el cumplimiento con cada una de sus órdenes, bajo apercibimiento de desacato. Esa ocasión fue la única vez

que el Tribunal de Primera Instancia utilizó el mecanismo del desacato. No obstante, aún bajo amenaza de desacato, el traslado del señor Jorge Moreu a una institución mental fue efectuada 71 días (dos meses y diez días) después.

Por un lado, la conducta del Departamento de Corrección y la ASSMCA reflejan gran indiferencia ante las órdenes de un foro judicial. Asimismo, es preocupante el menosprecio e insensibilidad que exhibieron ante la naturaleza del procedimiento al que se encontraban, el cual es de alto interés público.

Asimismo, la pasividad del foro primario es altamente preocupante. En Pueblo v. Pagán Medina II, supra, resolvimos que foro judicial ostenta el deber de tomar las previsiones necesarias para hacer cumplir la orden de reclusión de una persona no procesable "con la menor dilación posible; nuevamente, so pena de desacato". Íd., pág. 245. Esto, pues reconocimos, una vez más, que las personas declaradas incapaces de enfrentar el procedimiento en su contra permanecen encarceladas hasta tanto se tramite su traslado.

Cónsono con lo anterior, otros foros han utilizado el mecanismo del desacato ante entidades gubernamentales que reiteradamente incumplen con las órdenes del foro judicial. Entre múltiples ejemplos, el Juez Presidente de la Corte de Distrito Federal Gustavo Gelpí halló al Municipio de Dorado en desacato por incumplir las órdenes del Tribunal. Watchtower Bible Tract Society of New York, Inc. v. Municipality of Santa Isabel, Opinion and Order, USDC Civil No. 04-1452.

En consecuencia, el Tribunal de Primera Instancia tiene un deber imperante de velar porque las personas no procesables reciban el trato médico apropiado de manera inmediata. El trasfondo histórico de nuestras instituciones penales revela la necesidad de que seamos cautelosos y rigurosos al exigir la protección de la salud de los confinados y confinadas. El interés público exige que el foro inferior asuma esa responsabilidad diligente y efectivamente.

En el caso ante nuestra consideración, el foro inferior no fue asertivo en su rol de garantizar que el señor Jorge Moreu recibiera el tratamiento médico apropiado. Al contrario, no fue hasta la séptima y última vista de seguimiento que optó por utilizar el mecanismo del desacato. En consecuencia, entiendo que erró el Tribunal de Primera Instancia.

**V.**

Ante todas las protecciones que amparan a la población con enfermedades de salud mental, disiento del curso de acción tomado por la Rama Judicial. No puedo validar que una persona con una condición mental permanezca encarcelada por un término de 688 días. Nuestro rol desde la Rama Judicial exige que denunciemos una injusticia de esta envergadura y tomemos acciones afirmativas para remediarla. En consecuencia, hubiese declarado el encarcelamiento del señor Jorge Moreu como uno fundamentalmente inconstitucional. Asimismo, hubiese ordenado al Departamento de Corrección a cumplir con las responsabilidades que la Asamblea Legislativa delegó en éste y le exigiría que provea el trato de salud adecuado

que merecen **todos** los seres humanos. Finalmente, hubiese apercibido al Tribunal de Primera Instancia por permitir la dilación excesiva del procedimiento ante su consideración, la cual redundó en la privación de la libertad del señor Jorge Moreu de manera injusta y arbitraria.

Por todo lo anteriormente expuesto, disiento de la denegatoria de expedir el recurso de *certiorari* ante nuestra consideración.


Luis F. Estrella Martínez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Recurrido

       v.

José Luis Jorge Moreu          CC-2018-0945
Certiorari

    Peticionario

RESOLUCIÓN
(Nunc Pro Tunc)

San Juan, Puerto Rico, a 5 de febrero de 2019.

Se enmienda *nunc pro tunc* nuestra Resolución de 4 de febrero de 2019 a los únicos fines de hacer constar que el nombre correcto del Peticionario es José Luis Jorge Moreu.

Notifíquese **inmediatamente.**

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo.

José Ignacio Campos Pérez
Secretario del Tribunal Supremo